**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| AMANDA JURCZYK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-454-TCK-FHM |
| | ) | |
| COXCOM, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

.

## OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 38).

### I.      Factual Background

Plaintiff Amanda Jurczyk was employed by Defendant CoxCom, LLC ("Cox") or its predecessor from April 19, 1999 until August 23, 2013, when Cox terminated her employment. Plaintiff began employment as a Customer Care Representative, a position which requires answering calls from Cox customers.  In 2007, Plaintiff was promoted to Customer Care Representative II.  Her supervisors and customers praised her service skills throughout her employment, and there is no dispute that Plaintiff performed her job well when she attended work.

Plaintiff suffers from chronic migraine headaches.  In August 2005, Plaintiff first received certification for leave under the Family and Medical Leave Act ("FMLA") based on her migraines. Plaintiff routinely exhausted her twelve weeks of FMLA leave in a given year.  Plaintiff also had unexcused absences and received several warnings under Cox's attendance policy during her employment.  On January 11, 2013, Plaintiff received a Final Written Attendance Warning ("Final Warning") stating that she would be subject to termination if she had another unexcused absence within six months of that date, effectively creating a "one strike" period lasting six months.

At relevant times, Cox's third-party FMLA administrator was Unum Group ("Unum").  On May 16, 2013, Unum sent a letter to Plaintiff stating that her request for intermittent FMLA leave was approved from April 30, 2013 through October 17, 2013 ("May 2013 Approval").  She received authorization to take leave for treatments and during episodes of incapacity.  According to the approval letter, Plaintiff only had 48 minutes of FMLA leave remaining at that time.  The May 2013 Approval was based upon a medical certification provided by Plaintiff's neurologist, Dr. Jeanne Edwards.

During the "one strike" period under the Final Warning, on May 31, 2013, Plaintiff suffered a severe migraine headache while at work.  Her husband picked her up, and she was hospitalized due to the severity of the migraine.  It is undisputed that Plaintiff had exhausted available FMLA leave, and that the May 31, 2013 absence could have resulted in her termination under the Final Warning.  However, on June 3, 2013, Plaintiff filed an Unexcused Absence Exemption Request ("UAER") describing the circumstances of her absence.  Plaintiff's supervisor, Sheryl Lay ("Lay"), and Cox Senior Manager, Joe Scranton ("Scranton"), both recommended denial of the UAER.  Because they knew Plaintiff was under the Final Warning, they essentially recommended her termination.  In the "comments" section, Lay wrote:

> Amanda is a tenured employee who has ongoing attendance issues.  Her medical situation makes me want to approve this extenuating circumstance and the fact that she has really good customer service skills.  With that being said, I cannot depend on her for being @ work to handle our phone calls.  Currently on a final for attendance.  Termination depends upon the approval/disapproval of extenuating circumstances form.  Per HR only.  78 available FMLA[1]

---

[1] It is unclear what Lay meant by "78 available FMLA," given that the record is undisputed that Plaintiff had exhausted FMLA leave as of May 31, 2013.

(Ex. 7 to Pl.'s Resp. to Def.'s Mot. for Summ. J. (footnote added).)  The UAER was then sent to Cox Vice President, Shelli Osborn ("Osborn"), who had final authority to approve or deny the UAER.

On June 5, 2013, Lay or another Cox employee requested a Termination Review Form for Plaintiff.  On June 11, 2013, contrary to the recommendations of Lay and Scranton, Osborn approved the UAER.  Plaintiff therefore avoided termination at that time.  For reasons unclear to the Court, Cox first informed Plaintiff of Osborn's decision approximately two weeks later on June 25, 2013.

Sometime prior to June 21, 2013, Cox Human Resources Business Partner Melissa Cruts ("Cruts"), who works in Tulsa, began communicating with Cox Human Resources Manager Beth Tittiger ("Tittiger"), who works in Atlanta.  On June 21, 2013, Cruts sent an email to Tittiger stating she "wanted to share with [Tittiger] some of the information we have pulled together on [Plaintiff] in case you need it when you speak with Unum."  (Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J.) The "information" was a chart setting forth dates of Plaintiff's FMLA leave and Plaintiff's hours worked in the previous rolling twelve months.  (*See id.*)  Later, Tittiger responded:

> I talked with Sam Kidwell at Unum and he is comfortable with us moving forward with a recert now. To that end, I sent him a copy of this email with the attachment. It shows the number of FMLA days taken but it isn't clear which days bumped up to PTO, HOL and off days.  Can either one of you pull that together and Janice, can you forward to him?  Jkidwell@unum.com
> He said we can't do 2nd opinion until the next annual recert (in Oct.) but he's added a note to her case already to communicate to us prior to a final decision on that certification so we can determine if a 2nd opinion is needed at that time.
> Also...my bad.  I misunderstood the FMLA regs.  They only have to meet the 1250 FMLA hours once a year during their annual recert.  After that they can drop below those hours during the year but would need to be back at 1250 for the next annual recert to continue to be eligible.  Sorry to mislead!  I was thinking of their banked hours which are reviewed on a regular basis.

(*Id.*)

Upon receipt of this email, which made clear that Plaintiff satisfied the 1250 hour requirement, Cruts then directed Lay to prepare a calendar showing Plaintiff's excused and unexcused absences from November 2009 to June 2013 and attempting to show which FMLA days "bumped up" to paid time off, scheduled days off, and holidays, as suggested by Tittiger. According to Cruts, upon reviewing the calendar, she "reached the conclusion that [Plaintiff's] FMLA absences regularly occurred immediately before and/or after her regularly scheduled days off." (Cruts Aff. ¶ 11, Ex. 2 to Def.'s Mot. for Summ. J.)

On June 24, 2013, Cruts sent an email to Sam Kidwell ("Kidwell") at Unum stating that Tittiger asked Cruts to "send you the calendar we have created that shows the pattern of FMLA usage for [Plaintiff]" and attaching the calendar. The calendar is color-coded with gray for days off, green for paid time off, and orange for office closed. Also on June 24, 2013, Kidwell sent an internal email to another Unum employee referring to the calendar and stating: "Please see below. Per their request please recertify this leave based on a pattern of absences." (*Id.*)

On June 25 2013, Unum sent Plaintiff the following letter:

> . . .
> This letter is to notify you of the need to submit a medical certification.
> Your leave was approved from <u>April 30, 2013</u> through <u>October 17, 2013.</u>  Your approval dates have changed to <u>April 20, 2013</u> through <u>June 20, 2013</u> because of the following.
> A pattern of absences has been identified as you have routinely reported absences for the day prior to and the day following your normally scheduled days off. Specifically, you have reported the following absences:

4

| 4/30/2013 8:00 AM | Tue | 4/30/2013 7:00 PM | Tue | 10h, 0m | Episode |
| 5/8/2013 8:00 AM | Wed | 5/08/2013 7:00 PM | Wed | 10h, 0m | Episode |
| 5/24/2013 8:00 AM | Fri | 5/24/2013 7:00 PM | Fri | 10h, 0m | Episode |
| 6/14/2013 8:00 AM | Fri | 6/14/2013 7:00 PM | Fri | 10h, 0m | Episode |
| 6/17/2013 8:00 AM | Mon | 6/17/2013 7:00 PM | Mon | 10h, 0m | Episode |
| 6/20/2013 8:00 AM | Thu | 6/20/2013 7:00 PM | Thu | 10h, 0m | Episode |

The Health Care Provider must indicate whether the above pattern of absence is consistent with your/the patient's serious health condition and/or need for care.

Please provide the Health Care Provider with a copy of this letter (with the enclosed form).

In order to approve any additional leave, the enclosed medical certification form must be completed and submitted to Unum no later than <u>July 13, 2013.</u> If certification is not received by this date, additional leave may not be approved.

. . .

Any leave approved will be designated and counted against your FMLA entitlement(s). Any leave not approved will not be designated or counted against your available FMLA entitlement(s) and could be treated according to your employer's absenteeism policy.

(Ex. 21 to Pl.'s Resp. to Def.'s Mot. for Summ. J.) The letter did not attach the color-coded calendar, explain Plaintiff's work schedule, or otherwise clarify the "pattern" shown in the above chart.

Also on June 25, 2013, Osborn's decision on the UAER was first communicated to Plaintiff in a document entitled "Official Reprimand." Although Cox's "Official Reprimand" form is different than the Final Warning, it has the same effect of creating a "one strike" period during which any unexcused absence results in termination. It reads:

5

> Amanda, the Customer Care Leadership team including our V.P. Shelli Osborn reviewed your [UAER] submitted on 6/3/13 and approved it on 6/11/13.  This approval extends your Final Written Attendance Reprimand for an additional six months from the approval date -- your warning will expire on 12/11/13. . . . Cox Customer Care expects immediate improvement in this area of performance.  Future violations will result in progressive disciplinary action up to and including termination . . . .

(Ex. 40 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)  Thus, Plaintiff's new "one strike" period was extended from July 2013 to December 2013.

The next day, on June 26, 2013, Cruts and Lay met with Plaintiff.  They discussed approval of the UAER and also explained that they had identified a pattern in her FMLA use that caused them concern because her FMLA leave was consistently "bumping up" to days off and holidays, resulting in long weekends.  Plaintiff informed them she had chronic migraines and did not think about what days she was taking off.  Plaintiff further explained she had an auto-immune disease and was seeing various specialists.  Cruts told Plaintiff that Cox was "working with UNUM to understand if the pattern we see is in alignment with the medical condition that she is certified for and that we would continue to watch the situation."  (Ex. 8 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)

On July 10, 2013, Plaintiff missed work due to a migraine.  The following day, Plaintiff requested an extension from Unum in advance of her July 13, 2013 recertification deadline.  Unum forwarded Plaintiff's extension request to Tittiger:

> The employee states, after talking with her provider, that the physician may not be able to have the certification . . . as the physician has a lot of paperwork backed up.  The physician told the employee that he [sic] would submit the certification as soon as possible.

(Ex. 5 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)  Tittiger responded by stating that "this is not an extenuating circumstance so her original deadline is in place.  Also, this is an employee we recently

6

asked to recertify due to intermittent leave overuse so I would stress that she needs to do her best to adhere to the deadline." (*Id.*)

On July 12, 2013, Dr. Edwards returned the recertification form. The form was not dated, and it was identical to the certification she originally provided. As did the original certification, this certification answered question 13 by stating:

> a. Is it medically necessary for the patient to be off work due to episodic flare ups on an intermitten basis or to work less than the patient's normal work schedule? _X_ Yes __ No
> . . .
> b. Episodic flare ups:
>    - Estimated episode frequency _4-5_ times per __week __X__ month __ year
>    - Estimated episode duration ____ hours (or) _1-3_days( ) per flare up

(Ex. 26 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)

On July 15, 2013, Unum informed Plaintiff that the recertification was incomplete for the following reasons: (1) Dr. Edwards' response to question 13 was "insufficient because the pattern of absence was not addressed or is not supported;" and (2) the form was undated. Unum extended the deadline to July 25, 2013 and stated that if certification was not received by that date, her "leave will not be approved." (Ex. 24 to Pl.'s Resp. to Def.'s Mot. for Summ. J.) On July 15, 2013, Dr. Edwards sent the identical form, except that it was now dated. Plaintiff did not receive further notification that this recertification was deemed insufficient, and Plaintiff was not terminated at that time.

On July 24, 2013, Plaintiff was again absent due to a migraine. On July 26, 2013, after expiration of the July 25, 2013 deadline, Unum sent Plaintiff a letter stating that her recertification was insufficient and that her request for leave was not approved from June 21, 2013 through a date to be determined.

On August 16, 2013, Dr. Edwards sent to Unum the identical form she had sent twice before, except she hand-wrote the following in the margin next to question 13: "Migraines are unpredictable & absences cannot be determined accurately."  (Ex. 43 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)  Apparently, this was sufficient to explain or verify the alleged "pattern of absences," as Unum sent Plaintiff a letter on August 19, 2013 stating that leave would be approved on a going-forward basis from August 16, 2013 through October 17, 2013.  However, the letter also informed Plaintiff that any migraine-related leave taken from June 21 through August 15, 2013, would not be covered by the FMLA due to incomplete documentation on file during that time.

Based on Cox's denial of FMLA coverage for this three-week period, Plaintiff's July 10 and July 24 absences were deemed non-FMLA, unexcused for purposes of Cox's attendance policy and her "one strike" period.  On August 23, 2013, Cox terminated Plaintiff's employment.  The Termination Review Form, which was first requested by a Cox employee back on June 5, 2013 and finally completed on August 23, 2013, cites violation of the attendance policy as the basis for termination.

On July 10, 2014, Plaintiff filed this lawsuit asserting four claims for relief.  Based on the parties' arguments and the Court's prior dismissal of Plaintiff's claim for intentional infliction of emotional distress, the following claims and theories remain: (1) Cox terminated Plaintiff based on the disability of chronic migraines, in violation of 42 U.S.C. § 12112 of the Americans with Disabilities Act ("ADA") ("ADA Discrimination");[2] (2) Cox terminated Plaintiff in retaliation for exercising her FMLA rights, in violation of 29 U.S.C. § 2615(a)(2) ("FMLA Retaliation"); and (3)

---

[2]  Plaintiff abandoned any ADA theory based exclusively upon a failure to provide a reasonable accommodation.  Instead, she focused her ADA claim upon a disability-based termination.  (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. 36-42.)

Cox interfered with Plaintiff's exercise of FMLA rights, in violation of 29 U.S.C. § 2615(a)(2) ("FMLA Interference").  Cox moves for summary judgment on all remaining claims.

## II.      Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## III.      FMLA Interference

The FMLA "provides that eligible employees of certain employers have the right to take unpaid medical leave for a period of up to twelve work weeks in any twelve month period for a serious health condition as defined by the Act." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 959 (10th Cir. 2002).  The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise these rights, 29 U.S.C. § 2615(a)(1), and such a claim is referred to as an "interference" claim.

To establish an FMLA interference claim, Plaintiff must show: (1) she was entitled to FMLA leave; (2) an adverse action by Cox interfered with her right to take FMLA leave; and (3) Cox's

adverse action was related to the exercise or attempted exercise of her FMLA rights.  *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).  A denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, and the burden-shifting analysis applied to Title VII and FMLA retaliation claims does not apply to FMLA interference claims.  *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).

Cox challenges the first and second elements -- entitlement and interference.  Cox contends Plaintiff was not entitled to FMLA leave on the dates of the absences which triggered her termination (July 10 or 24, 2013) because the undisputed facts demonstrate that Plaintiff failed to comply with the recertification request for absences occurring from June 21, 2013 to August 15, 2013.  Without entitlement to leave, Cox contends, it could not have interfered with her FMLA rights.  Plaintiff argues that jury questions abound as to whether the recertification request was reasonable, whether the recertification adequately explained the pattern of absences for which clarification was sought, and whether Dr. Edwards' responses prior to August 16, 2013, complied with the request.  Because the analyses of entitlement and interference substantially overlap, the Court addresses both elements simultaneously.

### A.    Decision to Request Recertification

By statute, an employer may "obtain subsequent recertifications on a reasonable basis."  29 U.S.C. § 1613(e).  "An unreasonable demand for recertification may interfere with FMLA rights."  *Smith v. City of Niles*, 505 F. App'x 482, 484 (6th Cir. 2012).

The May 2013 Approval informed Plaintiff that she was entitled to intermittent FMLA leave from April 20, 2013 through October 17, 2013.[3] Where, as here, the medical certification indicates the employee will need intermittent leave for an indefinite duration, an employer may generally request recertification only every six months and in connection with a specific absence. 29 C.F.R. § 825.308(b). However, exceptions exist if: (1) the employee requests an extension; (2) circumstances described by the previous certification have changed significantly (*e.g.*, the duration of the illness, the nature of the illness, or complications); or (3) the employer receives information casting doubt on upon the continuing validity of the certification. 29 C.F.R. § 825.308(c).

Cox relies on the second exception -- significantly changed circumstances -- to justify its requesting recertification earlier than six months. The regulations provide the following relevant example of a significant change in circumstances:

> [I]f an employee had a pattern of using unscheduled FMLA leave for migraines in conjunction with his or her scheduled days off, then the timing of the absences also might constitute a significant change in circumstances sufficient for an employer to request a recertification more frequently than every 30 days[.]

*Id.* Cox contends that, because this was precisely its *stated* reason for requesting recertification, its request was reasonable as a matter of law.

Construing all facts in favor of Plaintiff, a jury could deem the request for recertification as unreasonable. Cox purported to identify a "pattern" of taking FMLA leave "prior to and the day following" Plaintiff's "normally scheduled days off." (Pl.'s Ex. 21.) There are problems with this justification that render summary judgment improper. Plaintiff worked a four-day workweek consisting of Monday, Tuesday, Wednesday, and Friday, with scheduled days off on Sunday,

---

[3] "Intermittent leave" is FMLA leave taken "in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202.

Thursday, and Saturday.  Under this schedule, only one day a week (Tuesday) would not abut a "scheduled day off."  Therefore, in order to avoid taking absences that abutted days off, Plaintiff's migraines would need to occur on a Tuesday and last only one day.  However, Dr. Edwards' prior medical certification had already informed Cox that Plaintiff's condition had an episode frequency of 4-5 times per month with a duration of 1-3 days per flare-up.

Further, the facts and communications leading to creation of the "pattern of absences" calendar could raise an inference that there was not any genuine change in circumstances justifying the recertification request.  The Termination Request Form executed in August 2013 was first generated on June 5, 2013.  Only after Osborn approved the UAER and essentially allowed Plaintiff to maintain employment despite Lay and others' recommendations to terminate, Struts, Lay, and Tittiger began scrutinizing and discussing Plaintiff's FMLA leave.  Their communications could be viewed as brainstorming possible problems with Plaintiff's FMLA leave that could be used to either deny leave or justify a recertification request.  The possible problems identified included her number of qualifying hours and her use of FMLA days "bumping up" to scheduled days off.  Only after realizing Plaintiff met the hour requirement, Cruts instructed Lay to develop a calendar showing when Plaintiff took leave in relation to scheduled days off or holidays.  A jury could conclude that the calendar was a concocted justification to request recertification, curtail a period of previously granted FMLA leave, make it difficult for Plaintiff and Dr. Edwards to comply, and count the next migraine-related absence as the one strike needed for her termination.  The Court rejects Cox's argument that, because its *stated* reason for requesting recertification is provided as an example in the regulation, its recertification request on July 25, 2013 was reasonable as a matter of law.

### B.      Denial of Recertification for July 10 and 24

Even assuming the request itself was reasonable and based on a good-faith belief that Plaintiff's circumstances had changed in how she was taking FMLA leave, a jury could still find Plaintiff was entitled to FMLA leave on July 10 and 24.  Cox urges that summary judgment is proper because Plaintiff did not timely comply with the recertification request for these dates.  However, numerous facts preclude entry of summary judgment in favor of Cox on this question.  First, the letter to Plaintiff and her doctor identifying the "pattern of absences" is unclear.  The letter informs Plaintiff that she has "routinely reported absences for the day prior to and the day following your normally scheduled days off" and then lists six absences on Tuesday, April 30; Wednesday, May 8; Friday, May 24; Friday, June 14; Monday, June 17; and Thursday, June 20.  It then asks Dr. Edwards to indicate "whether the above pattern of absence is consistent" with migraines.  But the letter does not include Plaintiff's work schedule, rendering the chart virtually meaningless and making it difficult to understand the "pattern" necessitating clarification.  In addition, Dr. Edwards had already indicated that the migraines were episodic, could occur 4-5 times in the same month, and could last 1-3 days.  A jury could find a lack of clarity as to what *else* Dr. Edwards needed to provide, except somehow inform Cox/Unum that she either did or did not believe Plaintiff was telling the truth about suffering migraines on these specific days.

Second, a jury could conclude that Dr. Edwards' response to question 13 was sufficient to address the "pattern" in light of the limited information she was provided.  Although Dr. Edwards did not provide additional information beyond that provided in prior forms, she did resubmit signed, completed paperwork by the extended deadline of July 15, 2013.  This is not a case where the plaintiff and her doctor were ignoring the requests and making no efforts at all.  Further, when

Cox/Unum did finally approve the recertification in August on a going-forward basis only, it was apparently based upon Dr. Edwards' hand-written note in the margin that "migraines are unpredictable & absences cannot be determined accurately." (Pl.'s Ex. 43.)  A jury could view these notes as simply repeating what was already clear rather than adding any substantive medical verification that the "pattern" of absences was indeed consistent with Plaintiff's health condition.

In sum, a reasonable jury could conclude Cox interfered with FMLA leave to which Plaintiff was entitled because: (1) the request for certification was unreasonable; (2) the denial of recertification was not justified; and/or (3) the termination was based upon absences that should have been covered by the FMLA.  That the triggering absences on July 10 and 24, 2013, occurred during a short period of alleged technical non-compliance, and that Plaintiff ultimately obtained approval with only a few more words from her doctor, contribute to the existence of a jury question.


Cox relies on *Hobbs v. Sloan Valve Co.*, No. 1:14-CV-03482, 2015 WL 4231743, at *9 (N.D. Ill. July 10, 2015), wherein the court granted summary judgment to an employer that denied recertification based upon an incomplete recertification form and then terminated the employee based on absences.  *Hobbs* is distinguishable.  First, that case involved a routine recertification at the expiration of a previously granted term of intermittent leave, rather than in the middle of leave previously granted.  Nor were there emails raising an inference of intentional interference with previously granted leave.  The facts here render the request for and denial of recertification more suspect.  Second, in that case, the doctor had answered every question but on several different versions of forms, and the court held the employer was not obligated to cobble them together.  Here, the doctor answered every enumerated question on the form but failed to "write in" an explanation

in the margins or otherwise "explain" the purported pattern of absences identified in the accompanying letter.  Finally, the facts of *Hobbs* actually demonstrate why Cox is not entitled to summary judgment.  The court in *Hobbs* noted that, prior to answering a specifically enumerated question about the employee's pattern of absences (question 22 on the form), the doctor had "received a copy of Plaintiff's job description and the absence history necessary to answer question 22."  *Id.* at *2.  In this case, there was no expressly enumerated question requiring a hand-written answer, no clear location on the form for Dr.  Edwards to offer an explanation, and minimal and possibly misleading information given regarding the "pattern of absences" at issue.

## IV.    FMLA Retaliation

The FMLA prohibits an employer from retaliating against an employee for opposing a practice made unlawful by the FMLA.  29 U.S.C. § 2615(a)(2).  FMLA retaliation claims are subject to the burden-shifting framework of *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Campbell*, 478 F.3d at 1287. To make out a prima facie FMLA retaliation claim, Plaintiff must show that (1) she engaged in protected FMLA activity; (2) Cox took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *Metzler*, 464 F.3d at 1171.  If shown, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.* at 1290. The burden then shifts back to the plaintiff to show there is a genuine dispute of material fact as to whether the employer's reasons for terminating her are pretextual.  *Id.* at 1172. To establish a genuine dispute of material fact as to pretext, a plaintiff cannot rely solely on temporal proximity of her FMLA leave and the adverse employment action but instead must offer some other evidence

of retaliatory motive. *Id.* Cox challenges the adequacy of Plaintiff's evidence as to causal connection and pretext.

The third element of a prima facie case for FMLA retaliation requires a showing of "bad intent" or "retaliatory motive" by the employer. *Campbell*, 478 F.3d at 1287. The Court has already concluded Plaintiff may reach a jury on whether Cox interfered with her FMLA rights by denying her requests for leave on July 10 and 24, 2013 and terminating her for those absences. Now the question is whether Plaintiff has created questions of fact as to whether Cox did so with bad intent or retaliatory motive.

In Part III.A, the Court concluded that Cox's recertification request could be deemed unreasonable. For substantially the same reasons, a jury could conclude that (1) there exists a causal link between Plaintiff's use of FMLA leave and her ultimate termination; and (2) Cox's stated reason for Plaintiff's termination was a pretext for retaliating against Plaintiff based on excessive FMLA use. While Cox asserts it fired Plaintiff based on a non-FMLA qualifying absence under its attendance policy, a jury could conclude that the termination-triggering absence: (1) was in fact FMLA-covered (rendering the causal link with protected activity readily apparent); and/or (2) would have been covered by the May 2013 Approval but for the retaliatory motive of Cox employees, which led to the recertification request in the first place. In other words, a jury could conclude Cox became unhappy with Plaintiff's "overuse" of FMLA, interfered with her ability to take FMLA leave by unreasonably requesting and denying FMLA leave, and then terminated her. This is sufficient to establish a prima facie case of causation and to create questions of fact on pretext. *See Oliver v. Williams Co., Inc.*, No. 12-CV-0585-CVE-PJC, 2014 WL 1344496, at *8 (N.D. Okla. Apr. 4, 2014) (denying summary judgment on FMLA retaliation claim, in part, because emails suggesting that

employer was dissatisfied with amount of leave taken by plaintiff "supports a finding that defendant's termination of plaintiff's employment was retaliatory").

Cox argues its prior allowance of FMLA leave for several years counsels against any finding of bad intent on this occasion. However, that is simply a fact for a jury to weigh in assessing Cox's motives, rather than a fact that entitles it to summary judgment. Cox also relies upon Plaintiff's deposition testimony that (1) Lay and Cruts were nice to her during the June 26, 2013 meeting, and (2) she believes her termination was based on a miscommunication to show a lack of retaliatory intent. That Lays and Cruts did not display outward animosity toward Plaintiff does not mean Cox did not retaliate against her as a matter of undisputed fact and law. Further, Plaintiff's deposition testimony as a whole reveals that she felt wrongly and unfairly singled out when they requested recertification in the middle of a leave period that had already been granted.

In its reply brief, Cox cites the general principle that an employer's good-faith, reasonable belief that an employee has abused FMLA leave, even if mistaken, would not constitute a discriminatory firing. *See generally Medley v. Polk Co.*, 260 F.3d 1202, 1208 (10th Cir. 2001) (holding that defendant's requested "honest belief" charge should have been given to a jury and remanding for a new trial). This principle does not entitle Cox to summary judgment because, as the Court has explained, questions of fact exist as to whether Cox had an honest, reasonable belief or suspicion that Plaintiff had "abused" her FMLA leave when it requested recertification, when it denied recertification for a discrete period, and when it terminated her. Further, the facts do not fit neatly into the "honest but mistaken" line of decisions because Cox ultimately approved Plaintiff's leave request and fired her due to a brief period of *technical* non-compliance rather than an "honest but mistaken" belief of FMLA abuse. Under Cox's version of events, it identified a concerning

"pattern of absences" but then decided the pattern was adequately explained by Dr. Edwards' hand-written explanation that migraines were "unpredictable." Cox nonetheless felt compelled to terminate her for absences during a period when it had virtually the same information via past medical certifications. Thus, the "honest belief" rule does not entitle Cox to summary judgment in this case.

## V.     ADA Discrimination

The ADA prohibits employment discrimination on the basis of an employee's disability, stating that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[I]n order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that he (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011) (internal quotation marks omitted). Cox argues that Plaintiff cannot establish the second or third elements and further argues that Plaintiff cannot demonstrate that Cox's stated reason for termination was a pretext for disability discrimination.

The Court concludes that with respect to *disability* discrimination, Plaintiff cannot satisfy the third element of her prima facie case.[4] As explained above, the evidence demonstrates possible

---

[4] The Court does not reach the second element, including Cox's arguments that she was not qualified due to her need for medical leave and/or her because she declared on a Social Security Disability Insurance that she was disabled and unable to work.

discrimination against Plaintiff based upon her taking actual FMLA leave or taking what should have been FMLA leave.  Although subtle, this is different than discriminating against Plaintiff because of her disability of having chronic migraines.  As explained by Judge Eagan in a recent, similar case:

> Plaintiff has produced no evidence that her disability was a motivating factor in her termination, because this is not a case where a disability prevented her from performing certain job functions. Instead, she completely failed to report to work and her absences, not her underlying medical condition, prompted defendant to terminate her employment. Plaintiff's right to medical leave is protected by the FMLA, not the ADA, and the Court has found that there is a genuine dispute as to whether plaintiff was entitled to FMLA leave. . . . The Court finds no evidence suggesting that defendant's legitimate, non-discriminatory reason for terminating her employment was pretext for *disability* discrimination, and defendant is entitled to summary judgment on plaintiff's ADA claim.

*Oliver*, 2014 WL 1344496, at *10 (emphasis added).  Likewise here, there is no evidence that Plaintiff's migraines impacted her work performance, except to make her entirely unable to attend work.  Further, the email communications supporting the Court's finding of a jury question on intentional discrimination relate exclusively to Plaintiff's use of FMLA leave and not to Plaintiff's migraines or her inability to effectively perform her job when present.  While some cases may involve enough evidentiary overlap to reach a jury on both ADA and FMLA claims, the only potential discrimination supported by Plaintiff's evidence is based upon her use of the FMLA, not based upon any disability for which she qualifies under the ADA.  *See id.* ("While Plaintiff may have missed work due to a medical condition, the FMLA and ADA protect an employee against different types of discrimination.").

## VI.    FMLA Damages

The FMLA provides the following remedies:

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected--

(A) for damages equal to--

(i) the amount of--

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;

(ii) the interest on the amount described in clause (I) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (I) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (I) and (ii), respectively; and

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617(a)(1).

The remedial provisions of the FMLA are "strictly defined and measured by actual monetary losses," *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 738-40 (2003), and "courts have consistently refused to award FMLA recovery for such other claims as consequential damages and emotional distress damages," *Walker v. United Parcel Service, Inc.*, 240 F.3d 1268, 1277 (10th Cir. 2001) (internal citations omitted) (contrasting FMLA with Title VII remedies). Nominal damages are not available for an FMLA violation resulting in no monetary loss. *See id.*

(affirming judgment in favor of defendant where employee who received wrongful five-day suspension based on FMLA interference conceded she did not incur any monetary loss). Liquidated damages are available but only as tied to "lost wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(a)(i)(I) & (iii). Punitive damages are not available. *Saavedra v. Lowe's Home Centers, Inc.*, 748 F. Supp. 2d 1273, 1298 (D.N.M. 2010).

Cox seeks judgment on the issues of Plaintiff's entitlement to back pay, front pay, or any other statutory damages. Cox argues she may not recover these damages because: (1) she is physically unable to perform work of any kind due to her frequent migraines; and/or (2) she has failed to mitigate her damages. *See generally Thomsen v. City of Anadarko, Okla.*, No. CIV-05-1196-F, 2006 WL 2773230, at *3 (W.D. Okla. Sept. 25, 2006) ("Generally, an employer is not liable for back pay and front pay damages when an alleged improperly discharged employee is unavailable for work due to a disability."); *Brooks v. Via Christi Reg'l Med. Ctr., Inc.*, No. 08-1376-JTM, 2010 WL 446523, at *13 (D. Kan. Feb. 4, 2010) ("The duty to mitigate damages is applied in FMLA cases as well as other federal employment actions."). (*See* Def.'s Statement of Undisputed Facts 72-77; Def.'s Mot. for Summ. J., Proposition IV.) If Plaintiff is not entitled to lost wages, she may not be entitled to any compensatory damages even with a successful verdict in her favor on the FMLA claims. As explained above, neither emotional distress or nominal damages are available in FMLA cases, and the Court granted summary judgment on the ADA claim.

In her response to Defendant's statements of facts regarding damages issues, Plaintiff contends:

> This fact [regarding being unable to perform any work] is irrelevant, as her ability to secure subsequent employment is an issue related to damages, not liability. . .

Defendant could perform work with accommodations, and the Social Security Administration does not consider accommodations when deciding if someone is qualified for Social Security Disability Insurance benefits. . . . There are migraines that keep Plaintiff from working, but there are other instances where she is able to function while experiencing a headache or less severe migraine.

(Pl.'s Resp. to Statement of Facts 72-76.)  In her deposition, Plaintiff stated:

Q.   Okay. Has there ever been a point since August of -- August 23, 2013, that you have been unable to perform any job or any circumstances in some time period for that?

A.   If I were to apply for a job or get a job, I would say it would have been no different than if I was still working at Cox. The employer that I went to interview with, I would -- if they asked me why I got fired I am an honest person. I am going to tell them why, because I feel that upfront if they could offer me something to help -- if I told them upfront that I have this issue and they are aware of it, then it voids any conflict, but it would be no different if I was still working at Cox.

Q.   Okay.

A.   You know, I have migraines. They are -- I can't do anything about it. I had one last week that I had to go to the emergency room for that lasted four days and I had to have a brain scan because the whole left side of my body went numb. So, I mean, it is unfortunate, but it is part of my life and I just feel I have to deal with it.

Q.   Okay. And I thought I saw in your Social Security disability documents that you were saying that you had between 15 and 20 migraines a month; is that correct?

A.   Uh-huh, that is correct.

Q.   All right. And how long have you had -- how long have you been having -- since August of 2013, what period of time have you been having 15 to 20 migraines per month?

A.   I had them about three months until I started my new medicine and so far, like I said, I have had . . . [page cuts off]

(Jurczyk Dep. 167:18-168:25.)  She also stated that some of her headaches were not debilitating.

(*Id.* at 171.)

Awards of back pay and front pay are equitable decisions ultimately committed to the discretion of the Court.  *See Godinet v. Mgmt. & Training Corp.*, 56 F. App'x 865, 872 (10th Cir. 2003) (noting that district court "acted within the scope of its equitable discretion" in awarding

certain amount of back pay); *Davoll v. Webb*, 194 F.3d 1116, 1144 (10th Cir. 1999) ("The district court may consider all evidence presented at trial in formulating the proper award."). The Court will not enter partial judgment on damages issues for two reasons: (1) Plaintiff's deposition was taken on September 22, 2015, and she may inform the Court and/or jury of any changes in her ability to work and/or her mitigation efforts after that date; and (2) even Plaintiff's deposition testimony to date precludes a finding as a matter of law that she is entirely unable to work with accommodations of leave for migraines when necessary. Her declaration to the Social Security Administration is not dispositive of this issue. *See Holmes v. Sw. Reg'l Med. Ctr., Inc.*, No. 12-CV-225-JED-PJC, 2014 WL 5494932, at *6 (N.D. Okla. Oct. 30, 2014) (denying motion in limine on same question). Defendant is not precluded from filing a motion in limine on these issues, and Plaintiff is expected to provide an adequate responsive argument (which she failed to do at the summary judgment stage). However, the Court finds any ruling at this stage to be premature.

## VI. Conclusion

Defendants' Motion for Summary Judgment (Doc. 38) is granted in part and denied in part. It is denied as to FMLA Interference and FLMA Retaliation, and granted as to ADA Discrimination. The stay (Doc. 44) is lifted. The parties are ordered to submit a Joint Status Report setting forth proposed dates for remaining events no later than two weeks from the date of this Order.

**SO ORDERED this 10th day of June, 2016.**

**TERENCE KERN**
**United States District Judge**

23